USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/4/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CREDIT SUISSE FIRST BOSTON, LLC,

    Plaintiff,

 - against -

INTERSHOP COMMUNICATIONS AG,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04 Civ. 6854 (RJH)

**MEMORANDUM OPINION
AND ORDER**

   In this action, plaintiff Credit Suisse First Boston LLC ("CSFB") sues to enforce the indemnification clause of its September 28, 2000 underwriting agreement (the "Agreement") with defendant Intershop Communications AG's ("Intershop") relating to the initial public offering (the "IPO") of Intershop's American Depository Shares. CSFB seeks thereby to recover legal fees and expenses incurred in the successful defense of a securities class action lawsuit (the "Class Action") filed in connection with the IPO. Intershop now moves for leave to amend its answer pursuant to Fed. R. Civ. P. 15(a), in order to assert the defense that payment under the indemnification clause would violate the public policy underlying the federal securities laws. For reasons set forth below, the court concludes that indemnification in this case would not offend public policy. Therefore, leave to amend is denied on the ground that amendment would be futile.

### BACKGROUND

   Intershop is a German company that provides e-commerce software and support, whose securities were traded on the Neuer Market of the Frankfurt Stock Exchange. Although a well-known and successful player in Europe, Intershop was a relative

unknown in the United States, and in the late 1990s sought to penetrate the lucrative U.S. e-commerce software market. (Class Action Third Am. Compl. ("TAC"), ¶ 2; Compl. Ex. 2.) In 2000, Intershop relocated its headquarters to San Francisco, California, and centered its promotion efforts on its "Enfinity" software. (*Id.* at ¶¶ 50, 52.) The Enfinity product was designed as a system that an entire enterprise would use for all of its e-commerce, and the basic package price was ultimately set at approximately $300,000. (*Id.* at ¶¶ 3, 51.) In addition to licensing the Enfinity software package, Intershop's "other lines of revenue producing business" included post-licensing services such as installation, customer training, customer education, and technical support. (*Id.* at ¶ 64.) License sales in the United States, however, were low, and Intershop also experienced difficulty with customization, installation, and implementation of Enfinity for those sales that were accomplished. (*Id.* at ¶¶ 6, 53–55.) In an attempt to raise capital, Intershop conducted its IPO of American Depository Shares on the NASDAQ National Market System on September 29, 2000, selling 6.7 million shares for gross proceeds of $107 million. (*Id.* at ¶ 7.) CSFB participated in the IPO as one of the three lead managing underwriters, along with Chase H & Q and U.S. Bancorp Piper Jaffray. (*Id.* at ¶ 20.) On January 1, 2001, Intershop preannounced its fourth quarter results, reporting an expected loss of between € 30 and € 32 million, and the following day its stock price plummeted on both the Neuer Markt and NASDAQ. (*Id.* at ¶ 93.)

1. The Class Action

Thereafter in March 2001, the Class Action alleging violations of federal securities laws was brought against Intershop, CSFB and other defendants in the United States District Court for the Northern District of California, San Jose Division. *In re*

*Intershop Communications AG Sec. Litig.*, No. C-01-20333-JW (N.D. Cal.). Of particular relevance to the present action are Counts I and III of the TAC, wherein the class plaintiffs alleged violations of Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), and Section 11 of the Securities Act of 1933, as amended, 15 U.S.C. § 77k, respectively. The Section 10(b) claim was brought solely against Intershop (and its individual officers), and sounds in fraud. (TAC ¶¶ 20, 117.) The Section 11 claim was alleged against Intershop, its individual officers, CSFB, and co-underwriters, for "issuing a false and misleading registration statement and prospectus in connection with [Intershop's] . . . [IPO]." (*Id.* at ¶ 1.) The TAC expressly noted that the claim against CSFB "is not based upon fraud." (*Id.* at ¶ 117) (emphasis in original.)

### A. The Section 10(b) Claims

The fraudulent conduct underlying the Class Action's Section 10(b) claims arose out of a series of four allegedly false statements. The first was a statement contained in a May 10, 2000 press release that allegedly misrepresented Intershop's penetration into U.S. markets and the acceptance of its Enfinity software in the United States. (TAC ¶ 62.) The second was an August 2, 2000 press release reporting financial results for the second quarter and six months ended June 30, 2000 that were allegedly inflated by € 1.1 million as a result of Intershop's failure to reserve for bad debt. (*Id.* at ¶¶ 73, 74(c); *cf. id.* at ¶¶ 118–19.) The August 2, 2000 press release also allegedly misrepresented the length of the Enfinity software's implementation cycle, falsely stating that "several customers have gone live with their e-commerce application successfully within a few weeks after the project was initiated." (*Id.* at ¶ 73.) Third, Intershop issued a press release on October 31, 2000 that included its third quarter financial results. (*Id.* at ¶ 78.)

3

It contained allegedly false and misleading statements relating to Intershop's brand visibility in the United States, forecasts of fourth quarter revenues, and the competitiveness of the Enfinity software. (*Id.* at ¶¶ 78–79.) The fourth and final alleged false statement was made on or about November 22, 2000 by Intershop CEO Stephan Schambach. (*Id.* at ¶¶ 14, 80.) Schambach allegedly provided false and misleading target revenues for the fourth quarter. (*Id.* at ¶ 80.)

The motion to dismiss the Section 10(b) claims was granted in part in a series of three orders issued by Judge Ware on April 2, July 23 and November 5, 2003. *In re Intershop Communications AG Sec. Litig.*, No. C-01-20333-JW (N.D. Cal.). Read together, these orders make clear that the Court dismissed with prejudice the alleged overstatement of Intershop's second quarter 2000 income arising from an allegedly inadequate reserve for bad debt. (*Id.*, April 2 Order at 6–7; July 23 Order at 8–9; Nov. 5 Order at 2 ("[T]he portion of the Section 10(b) claim based upon accounting allegations must be dismissed.")). The portions of the Section 10(b) claim to survive included only the portion of the August 2, 2000 press release that allegedly misrepresented the length of Enfinity's implementation cycle, the October 31, 2000 statements regarding Intershop's improved brand recognition, and the November 22, 2000 interview by Schumbach. Subsequently, Intershop settled the remaining 10(b) claims without any admission of wrongdoing, effectively ending the Class Action.

B.  *The Section 11 Claim*

The Section 11 claim is based on the alleged overstatement of income in Intershop's financial statement for the first six months of 2000 that was included in the September 29, 2000 Registration Statement (SEC Form F-1). It is identical to the Section

4

10(b) claim arising out of the August 2, 2003 press release which also reported Intershop's six month figures. Thus, the TAC alleges that the Registration Statement was false in that it reported net income for the period that was inflated by € 1.1 million as a result of Intershop's failure to increase its bad debt reserve for uncollectible receivables. According to the class plaintiffs, the allegedly inadequate reserve violated Generally Accepted Accounting Principles and the Registration Statement's own stated license revenue recognition policies. (TAC ¶¶ 118-19.)

After several rounds of motion practice and at least two amended complaints, the court dismissed the Section 11 claim against all defendants finding that plaintiff had failed to properly allege materiality. Accordingly, the Section 11 claim was dismissed "with prejudice in its entirety." (Nov. 5 Order at 2.)

2.      The Current Action

Having successfully defended itself against the Section 11 claim in the Class Action, CSFB seeks indemnification for all legal costs and disbursements incurred in connection therewith. (Compl. ¶ 2.) The September 28, 2000 Agreement between Intershop and its lead underwriters, including CSFB, contains an indemnification clause providing that:

> [Intershop] will indemnify and home harmless each Underwriter . . . against any losses, claims, damages, or liabilities, joint or several, to which such Underwriter may become subject, under the [Securities Act of 1933] or otherwise, . . . and will reimburse each Underwriter for any legal or other expenses reasonably incurred by such Underwriter in connection with investigating or defending against any such loss, claim, damage, liability or action as such expenses are incurred.

(Underwriting Agreement (Sept. 28, 2000) ¶ 7(a), Compl. Ex. 1.)

5

Intershop moves for leave to amend its answer to include a sixth affirmative defense, whereby Intershop would assert that CSFB's indemnification claim is barred by public policy since CSFB was allegedly complicit in the Section 10(b) violations asserted against Intershop (and not CSFB) in the Class Action, and is therefore barred from recovery under the principles enunciated in *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969), *cert. denied* 397 U.S. 913 (1970), and its progeny.

## DISCUSSION

1. Rule 15(a)

Once a responsive pleading has been filed by the defendant, a party may amend its pleading "only by leave of the court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). The Rule further instructs that such leave "shall be freely given when justice so requires." *Id.* In the Second Circuit, a party is generally afforded leave to amend a pleading under Rule 15(a) "unless the movant has acted in bad faith, the amendment will prejudice the nonmovant, or the amendment is futile." *Neshewat v. Salem*, 365 F. Supp.2d 508, 515 (S.D.N.Y. 2005) (citing *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987); *Posadas de Mexico, S.A. de C.V. v. Dukes*, 757 F.Supp. 297, 300) (S.D.N.Y. 1991)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). In reviewing futility under a 12(b)(6) standard, "Second Circuit caselaw makes clear . . . that a district court addressing the futility of proposed amendments to a complaint should consider whether the amendments are sufficient on the merits." *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793, 2005 WL 500377, *3 (S.D.N.Y. Mar. 2, 2005) (citations omitted).

An amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6). *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). In the case of an amendment to add a new defense, futility ought technically turn on the proposed defense's legal sufficiency and whether it is subject to a motion to strike under Fed. R. Civ. P. 12(f). *See, e.g., Schaghticoke Tribe of Indians v. Kent*, 423 F. Supp. 780, 783 (D.Conn. 1976) ("If the amended defenses are legally insufficient so as to invite a motion to strike under Rule 12(f), however, it would serve no purpose to allow the amendment . . . ."). However, the distinction in this case is largely semantic, since the standard by which 12(f) and 12(b)(6) motions are evaluated are "mirror image[s]." *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058, 2004 WL 1872421, at *2 (S.D.N.Y. Aug. 19, 2004) (citing *Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, 03 Civ. 1730, 2003 WL 22928602, at *8 (S.D.N.Y. Dec. 12, 2003)). If a proposed amendment seeks to add a defense "which is obviously insufficient for the purpose for which it is offered, so that the amendment will be a useless act, the court will not grant such an amendment." *Helander v. Patrick*, 77 Civ. 2401, 1981 U.S. Dist. LEXIS 12773, **13-14 (S.D.N.Y. May 6, 1981); *see also* 6 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1487, at 637 ("If the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend.").

2.   Indemnification Agreements in the Context of the Securities Law

Indemnification for liability under the securities law is disfavored by the courts. Given the risk that indemnification agreements will undermine the strong public policy underlying the anti-fraud provisions of the 1933 and 1934 Acts, courts are reticent to

7

enforce them. Thus in its seminal opinion, *Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969), *cert. denied* 397 U.S. 913 (1970), the Second Circuit affirmed the district court's decision to deny indemnification where an underwriter was found to have actual knowledge of material misstatements in a registration statement. In reaching its decision, the court cautioned that enforcement of an indemnity agreement in certain circumstances could "encourage flouting the policy of the common law and the Securities Act." *Id.* at 1288. Indeed, the Securities Act of 1933 and the Securities Exchange Act of 1934 were passed by Congress in the midst of a depression that Congress believed was the result of "[e]xcessive speculation." S. Rep. No. 792, 73d Cong., 2d Sess. 3 (1934). Congress expressly premised the imposition of civil sanctions under the Securities Acts on the inadequacy of criminal penalties to "*prevent* the exploitation of the investor." *Id.* at 13 (emphasis added). Thus the overriding purpose of Congress in enacting Section 11 was not so much to impose liability for the benefit of investors injured by a defective registration statement but rather to stimulate diligence on the part of those persons who are actually responsible for the preparation of registration statements. *Globus*, 418 F.2d at 1288. The *Globus* court was "particularly suspect" of the indemnification of underwriters by issuers suggesting that the "'in terrorem effect' of civil liability might well be thwarted if underwriters were free to pass their liability on to the issuer." *Globus, Id. (citing* 3 Louis Loss, *Securities Regulation* 1831 (1969)); *see also* Harry Shulman, *Civil Liability and the Securities Act*, 43 Yale L.J. 227, 253 (1934) ("Civil liability is imposed partly for the purpose of compensating investors, partly, and probably more, for the purpose of compelling compliance with the Act so as to avoid certain types of losses and the need of compensation."). *Globus* has been widely followed, and precludes

8

indemnification of a party who has been adjudicated to have engaged in reckless, willful or criminal conduct. *See Cambridge Fund v. Abella*, 501 F. Supp. 598, 618 (S.D.N.Y. 1980); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F. Supp. 112, 135–36 (S.D.N.Y. 1974); *In re Olympia Brewing Co. Sec. Litig.*, 674 F.Supp. 597, 610 & 612 n.12 (N.D. Ill. 1987) (concluding that "courts uniformly have denied defendants the right to indemnity in federal securities law cases where those defendants acted with an intent to commit a violation of those laws").

While the Second Circuit expressly noted in *Globus* that it was only considering the case "where the underwriter had committed a sin graver than ordinary negligence" 418 F.2d at 1288, its analysis of public policy was explicitly based on Section 11 of the 1933 Act which establishes negligence as a basis for liability. It is hardly surprising that courts in this district and elsewhere readily extended *Globus*'s reasoning to preclude indemnification in cases involving negligent misrepresentations. Thus, in *Odette v. Shearson, Hammill & Co.*, 394 F.Supp. 946, 956 (S.D.N.Y. 1975), the district court found *Globus*'s holding broad enough to cover negligent misconduct in violation of Section 12(2). *See Crazy Eddie Sec. Litig.*, 740 F.Supp. 149, 151 (E.D.N.Y.); *Eichenholtz v. Brennan*, 52 F.3d 478, 484–85 (3d Cir. 1995) (agreeing with the *Odette* holding that the "policy against allowing indemnification extends to violations of sections 11 and 12(2), where the underwriter is merely negligent in the performance of its duties"); *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir. 1980).[1] In keeping with *Globus*'s reasoning, indemnification for liability under a

---

[1] Other jurisdictions that have permitted indemnification for negligent violations of the Securities Act have done so only where the indemnitor is the party "significantly more liable" for the injury to the plaintiff. *Adalman v. Baker, Watts, & Co.*, 599 F. Supp. 752, 755 (D. Md. 1984), *aff'd in part and rev'd in part on other grounds*, 807 F.2d 359 (4th Cir. 1986).

9

negligence standard would equally "undermine[] the role of the underwriter as 'investigator and public advocate,'" *Eichenholtz*, 52 F.3d at 485, in contravention of federal public policy.

*Globus* has also been extended to prohibit indemnification of a party who settles securities law claims without admitting fault, *unless* that party actually demonstrates that it is without fault. *Greenwald v. Am. Medcare Corp.*, 666 F. Supp. 489, 493 (S.D.N.Y. 1987) (allowing a cross-claim for indemnification to continue where director settled, but only if he proved he was without fault and therefore so entitled); *Donaldson Lufkin & Jenrette Secs. Corp. v. Star Techs., Inc.*, 561 N.Y.S.2d 371, 374 (N.Y. Sup. Ct. 1990), *aff'd on reh'g*, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd mem.*, 567 N.Y.S.2d 1002 (N.Y. App. Div. 1992) (applying federal securities law and following *Greenwald* approach); *Goldstein v. Alodex Corp.*, 409 F. Supp. 1201, 1205–06 (E.D. Pa. 1976) (finding that indemnification of individual directors and officers for litigation expenses incurred in defending a Section 11 claim would not "contravene the public policy of the Securities Act of 1933" where the court found "that the directors . . . acted in good faith in connection with the registration statement"). The *Donaldson Lufkin* court articulated the rationale behind precluding indemnification absent a showing of nonliability as follows:

> To . . . enforce the indemnity clause would result in treating a settlor in the same manner as if it were found to be without fault. This I find would be violative of Federal policy as the settlement may well have occurred where, as a result of discovery, the facts clearly showed that the settlor had violated the securities regulations. Although the law favors resolution of disputes, allowing a wrongdoer to obtain indemnity because he pays before a jury verdict rather than afterward would not encourage the reasonable care required of underwriters under Federal law.

561 N.Y.S.2d at 373-74.

The approach in *Greenwald* and *Donaldson Lufkin* is exacting on those who seek indemnification but is consistent with the premise that one who is not at fault may enforce a contractual agreement for the indemnification of expenses incurred in the *successful* defense of securities laws claims. While not explicitly endorsing indemnification in this circumstance, the Securities and Exchange Commission uses its acceleration power to express its policy position. Regulation S-K, Item 512, denies acceleration of effectiveness for a registration statement if provisions for indemnification exist, absent an undertaking to the following effect:

> Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted . . . the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (*other than* the payment by the registrant of expenses incurred or paid . . . in the *successful defense* of any action, suit or proceeding) is asserted . . . , the registrant will . . . submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

17 C.F.R. § 229.512 (emphasis added). By inference it seems clear that, in the view of the SEC, the policies underlying the securities laws are not offended by indemnification by the issuer where the indemnitee has successfully defended itself on the merits. *See also* X Louis Loss & Joel Seligman, *Securities Regulation* 4733 (3d ed., rev. vol. 2005) ("The Commission's view of § 11 does not interfere, of course, with the issuer's reimbursing officers or directors who have been *successful* in defending § 11 actions, with or without a prior agreement to do so, at least when they have won an adjudication

on the merits.") The Private Securities Litigation Reform Act of 1995 is more explicit and provides that "In any case in which a contract permits, a covered person that prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action." 15 U.S.C. § 78u-4(f)(2)(B)(ii). And in *Steinberg v. Pargas, Inc.*, 1985 WL 431 (S.D.N.Y. Mar. 19, 1985), the court held an indemnification agreement under which an acquiring company agreed to indemnify the target company's officers and directors for liability arising out of the acquisition was enforceable if the claims asserted against those officers and directors were without merit. Thus there appears to be no basis in statute or case law to support an argument that indemnification agreements are unenforceable when they compensate an underwriter for attorney's fees and other expenses incurred in successfully defending against a securities lawsuit. *See Donaldson Lufkin*, 561 N.Y.S.2d at 373 (citations omitted) ("[A] party found not at fault is entitled to enforce an indemnification provision."). Nor is there any question that CSFB successfully defended itself against the Section 11 claim alleged in the Class Action. A dismissal with prejudice on a motion under Rule 12(b)(6) means that the class plaintiffs failed to allege any set of facts that, even when assumed to be true, could state a colorable claim under Section 11 of the Securities Act. *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) ("[A] complaint should not be dismissed for failure to state a claim [under 12(b)(6)] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (citation omitted); *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (stating that in evaluating a motion under 12(b)(6) "we accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor").

3.  Intershop's Proposed Expansion of *Globus*

The issue presented by Intershop in the instant motion, however, adds an additional layer of complexity: may an indemnitor avoid its contractual obligation to reimburse legal expenses incurred in the successful defense of a securities action by alleging a separate violation of the securities laws, one that was never asserted against the indemnitee?

Based on an internal investigation conducted after CSFB won dismissal with prejudice of the Section 11 claim, Intershop now alleges that CSFB may have been involved in the violation of 10(b) asserted—not against CSFB—but solely against Intershop (and its individual directors and officers) and that proof of such "wrongful" conduct would constitute a defense to CSFB's indemnification claim. (Def. Supp. Mem. 3.) According to Intershop, this investigation reveals that CSFB may have "play[ed] a central role in the conduct that formed the basis for the . . . 10(b) claim" alleged against and settled by Intershop. (*Id.*) That circumstantial evidence allegedly reveals that "CSFB did in fact publish substantially similar allegedly false or misleading statements concerning Intershop's 3Q 2000 and year 2000 estimated revenue projections to investors in Europe, very likely did so at 'road shows' in the United States as well, and may even have participated in the particular press releases and statements directly cited in the . . . Third Amended Complaint." (*Id.* at 5–6.) Intershop posits that that "[t]o the extent CSFB did in fact negligently, recklessly or knowingly publish the same allegedly false or misleading financial information that was the foundation of the Class Action plaintiffs' fraud claim, well-established law in this Circuit precludes CSFB from realizing the benefit of an indemnification provision with respect to its fees in that Class Action," (*id.*

13

at 13), and considers it "irrelevant" that the Class Action did not name CSFB as a defendant in its 10(b) claim, (*id.* at 18). Assuming *arguendo* that Intershop's new allegations against CFSB could form the basis of an actionable fraud claim[2] the question is whether such alleged fraudulent conduct ought to bar the enforcement of the indemnification agreement as violative of public policy. The Court thinks not.

First, the enforcement of the indemnification agreement with respect to expenses incurred in the successful defense of the Section 11 claim does not allow CSFB to "pass [its] liability on to the issuer." *Globus*, 418 F.2d at 1288. This shifting of liability is at the heart of the Second Circuit's concern in *Globus* where the public policy defense was based on an *adjudication* of wrongdoing. There has been no finding of liability or wrongdoing here. To the contrary, the Section 11 claims against CSFB were dismissed with prejudice, which constitutes an adjudication on the merits in favor of CSFB. Further, to the extent CSFB may have violated Section 10(b), the consequences of that violation are not being passed along to Intershop by the enforcement of the indemnification agreement here.

Neither is this case analogous to *Greenwald*, which Intershop relies on to support its argument that a prior adjudication of wrongdoing is not a prerequisite to the assertion of its public policy defense. (Def. Supp. Mem. 15.) Intershop's reliance on *Greenwald* for this argument is misplaced. In *Greenwald* the court ruled that a settling co-defendant must demonstrate that he is without fault before taking advantage of an indemnification clause. This holding is consonant with the deterrent purpose underlying the securities

---

[2] This assumption is dubious. To establish its defense, it would appear that *Intershop* would have to allege and presumably prove that it, as issuer, and CSFB, as underwriter, defrauded Intershop shareholders. Not surprisingly, Intershop never goes so far in its proposed amended answer, asserting only that CSFB may have disseminated financial information alleged by the class plaintiffs (but not by Intershop) to have been fraudulent.

14

laws since a settling defendant is not necessarily without fault as to the settled claim. The circumstances presented in the present case simply do not implicate the concerns of *Greenwald*. As an initial matter, in *Greenwald* the settling party sought indemnification for the costs of defending against the *same claim* that was settled. Furthermore, this case does not involve a settlement but a dismissal with prejudice. Under Rule 12(b)(6), this means that no facts were alleged in the Class Action that could support a claim under Section 11. *See supra* (citing cases). As such, CSFB has established that it was without fault as to the dismissed claim. Intershop points out in its brief that "[t]he most that CSFB can say in this case is that the Court presiding over the Class Action ruled that the Section 11 claim asserted against CSFB . . . suffered from fatal pleading defects." (Def. Supp. Mem. 17.) This is, in fact, saying quite a bit. Not only is a dismissal with prejudice at the pleading stage "better" than a settlement without admission or denial of liability, as CSFB correctly argues, (Pl. Opp. Mem. 9), it is arguably also "better" than a successful defense at a later stage in the proceedings since here the class plaintiffs could not even muster enough to state a cause of action in the first instance.

Ultimately, the fraudulent conduct by CFSB alleged by Intershop in its proposed amendment relates to purported wrongdoing underlying the Class Action's 10(b) claim filed only against Intershop. Therefore, it relates to a claim that CFSB did not incur any costs defending and the enforcement of the indemnification clause does not, as applied in this case, cover any fraudulent conduct.[3] Despite Intershop's arguments to the contrary, no court has extended *Globus* to preclude indemnification where, as in this case: (i) the claims against the party seeking indemnification have been dismissed *with prejudice*; and

---

[3] In many securities cases a defendant may be named in two or more causes of action and succeed in dismissing some but not all of the claims. The Court is not faced with such a scenario and does not address the public policy implications of permitting indemnification in such an instance.

15

(ii) the "wrongful" conduct that allegedly precludes indemnification was never alleged against the indemnitee in the underlying action. Under Intershop's theory, an indemnitor may raise allegations of securities law violations beyond the scope of the indemnitee's claim for indemnification in order to avoid its contractual obligations. Adoption of this approach would render illusory the recognized availability of indemnification for expenses incurred in the successful defense of a securities action.

## CONCLUSION

For the foregoing reasons, the Court finds that Intershop's public policy defense would be "insufficient as a matter of law," and the proposed amendment would therefore be futile. *Oneida Indian Nation v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003), *rev'd on other grounds*, 125 S.Ct. 1478 (2005) (a proposed amendment to a pleading is considered futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *SEC v. KPMG, LLP*, 03 Civ. 671, 2003 WL 21976733, at *2 (S.D.N.Y. Aug. 20, 2003) (affirmative defense should be stricken where insufficient as a matter of law to eliminate the delay and unnecessary expense from litigating the invalid claim).

Defendant's motion to amend its answer [31] is denied.

SO ORDERED

Dated: New York, New York
January 3, 2006

Richard J. Holwell
United States District Judge